21CA0701 Peo in Interest of EDA 01-27-2022 COLORADO COURT OF APPEALS Court of Appeals No. 21CA0701 Adams County District Court No. 20JV59 Honorable Patrick Harold Pugh, Judge The People of the State of Colorado, Appellee, In the Interest of E.D.A., a Child, and Concerning J.N.S. and D.A., Appellants. JUDGMENT AFFIRMED Division VII Opinion by JUDGE BROWN Berger and Johnson, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 27, 2022 Heidi M. Miller, County Attorney, Julie Thomerson, Assistant County Attorney, Westminster, Colorado, for Appellee Anna N.H. Ulrich, Guardian Ad Litem Pamela K. Streng, Office of Respondent Parents’ Counsel, Georgetown, Colorado, for Appellant J.N.S. Harald Van Gaasbeek, Office of Respondent Parents’ Counsel, Fort Collins, Colorado, for Appellant D.A. 
1 ¶ 1 In this dependency and neglect proceeding, J.N.S. (mother) and D.A. (father) appeal the juvenile court’s judgment terminating their parent-child legal relationships with E.D.A. (the child). We affirm the judgment. I. Background ¶ 2 The Adams County Human Services Department (the Department) filed a petition in dependency and neglect, alleging that the three-year-old child was with mother when she was stopped by police while driving a stolen vehicle that contained methamphetamine and foils. After she was arrested, mother asked her partner to take the child to paternal aunt and uncle. ¶ 3 Father was in another state at the time of mother’s arrest, but the petition alleged that, on the day the Department requested a court hold to obtain custody of the child, father went to paternal uncle’s house and absconded with the child. Father later returned the child, and the Department placed him with a great aunt and uncle, where he stayed for the remainder of the proceeding. ¶ 4 The juvenile court adjudicated the child dependent and neglect by default. The court adopted treatment plans for mother and father requiring, among other things, that they (1) complete 
2 substance abuse and mental health evaluations and engage in any recommended treatment; (2) submit to random sobriety testing; (3) participate in child protection therapy; and (4) visit the child regularly. ¶ 5 The Department later moved to terminate mother’s and father’s parental rights. After a hearing, the juvenile court terminated the parent-child legal relationships between mother, father, and the child. II. Continuance ¶ 6 Father contends that the juvenile court abused its discretion by denying his counsel’s request for a continuance so that he could be located to reappear and testify at the Webex hearing. We disagree. A. Relevant Law ¶ 7 A parent has a fundamental liberty interest in the care, custody, and control of their child. Troxel v. Granville, 530 U.S. 57, 66 (2000). To protect the parental liberty interest, due process requires the court to provide fundamentally fair procedures to a parent facing termination. A.M. v. A.C., 2013 CO 16, ¶ 28; see also L.L. v. People in Interest of R.W., 10 P.3d 1271, 1276 (Colo. 2000). 
3 Due process is flexible and calls for such procedural protections as the situation demands. A.M., 2013 CO 16, ¶ 28. At a minimum, it requires that a parent receive adequate notice of a termination hearing and the opportunity to be heard and defend. People in Interest of E.B., 2022 COA 8, ¶ 11. The right to be heard includes affording the parent the right to cross-examine adverse parties and call witnesses to testify. A.M., 2013 CO 16, ¶ 29. ¶ 8 The Children’s Code directs courts to “proceed with all possible speed to a legal determination that will serve the best interests of the child.” § 19-1-102(1)(c), C.R.S. 2021. Consequently, when ruling on a motion to continue a termination hearing, the juvenile court must balance the need for orderly and expeditious administration of justice against the facts underlying the motion and the child’s need for permanency. C.S. v. People in Interest of I.S., 83 P.3d 627, 638 (Colo. 2004). The juvenile court may grant a continuance “only upon a finding that a manifest injustice would occur in the absence of a continuance.” Chief Justice Directive 96-08, Directive Concerning the Processing of Dependency and Neglect Cases, § 4 (Dec. 2, 1996). 
4 ¶ 9 Because the child was less than six years old when the petition in dependency and neglect was filed, the expedited permanency planning (EPP) provisions apply. See §§ 19-1-102(1.6), 19-1-123, C.R.S. 2021; E.B., ¶ 13. The EPP provisions require that the child be placed in a permanent home as expeditiously as possible and that the court hold the termination hearing within 120 days after the motion to terminate parental rights is filed. §§ 19-1-
102(1.6), 19-3-508(3)(a), 19-3-602(1), C.R.S. 2021. In EPP cases, the juvenile court shall not delay or continue the termination hearing “unless good cause is shown and unless the court finds that the best interests of the child will be served by granting a delay or continuance.” § 19-3-104, C.R.S. 2021; see also §§ 19-3-
508(3)(a), 19-3-602(1). ¶ 10 Whether to grant a motion for a continuance is a decision within the juvenile court’s discretion, and we will not disturb its ruling on appeal absent an abuse of that discretion. C.S., 83 P.3d at 638. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. E.B., ¶ 14. 
5 B. Additional Background ¶ 11 The juvenile court held the termination hearing via Webex. In opening statement, father’s attorney stated that father intended to testify. Father appeared by video at the beginning of the hearing but, during the caseworker’s testimony, he disconnected. The court asked father’s attorney to reach out to him and ask him to reconnect. ¶ 12 When the caseworker’s testimony concluded, father’s attorney reported that she could not reach him. The juvenile court recessed for lunch and asked father’s attorney to continue to try to contact father. After the lunch break, father’s attorney again reported that she had tried to text, phone, and email father, but was unable to reach him. She requested a continuance so that father could be located, arguing that a parent has a due process right to be present and defend against the motion to terminate. ¶ 13 The court noted that the case had been pending for fourteen months, that the hearing had been set for a couple of months, and that each parent had appeared at only one prior hearing in the case. It acknowledged that “parents should have the right to testify if they so choose,” but it explained that a parent does not have a 
6 constitutional right to be present during the hearing if represented by competent counsel. It further noted that it had no indication that father was physically unable to appear and testify. “[B]ased on the totality of the circumstances” at the time, the court found that a continuance would not be in the child’s best interests. It denied the request but instructed father’s attorney to continue trying to locate father, including by sending someone from her office to his residence, while it proceeded to hear mother’s testimony. ¶ 14 After mother’s testimony, father’s attorney again requested a continuance to have additional time to locate father. After specifically considering “the due process implications” of its decision, the juvenile court again denied the request for a continuance. It found that father’s failure to log back on to the virtual platform without explanation did not justify continuing the hearing and that proceeding with the hearing did not violate father’s due process rights. The court noted, however, that if father could demonstrate that his failure to reappear at the Webex hearing was “due to forces outside of his own control or his own decisions,” it would entertain a motion under C.R.C.P. 59 or 60. 
7 C. Analysis ¶ 15 Because this is an EPP case, the juvenile court should not have continued the termination hearing unless father showed good cause for the continuance and unless the court found that the best interests of the child would be served by the continuance. § 19-3-
104. Even assuming that father’s unexplained absence from the Webex hearing constituted good cause, the court found that a continuance was not in the best interests of the child. Because the record supports this finding, the court did not abuse its discretion by denying the continuance. ¶ 16 Although this was an EPP case, the child had been out of the home for fourteen months and more than 100 days had passed since the Department filed its motion to terminate parental rights. The court expressed its concerns about further delay when denying the motion to continue. Even so, father’s attorney did not argue that there was good cause to continue the hearing or that the child’s best interests would be served by the requested continuance. Instead, father’s attorney argued only that father would be denied due process if the court did not continue the hearing to allow him to appear. 
8 ¶ 17 When a parent has the opportunity to appear at a termination hearing through counsel, their absence does not offend due process. People in Interest of V.M.R., 768 P.2d 1268, 1270 (Colo. App. 1989). Father received notice of, appeared at, and was represented by counsel at the termination hearing. When it came time for father’s testimony, father was no longer logged on to Webex. The court gave father’s attorney a few hours to locate him, but he did not respond to texts, phone calls, or emails. ¶ 18 On appeal, father does not explain why he disconnected from the hearing, why his counsel could not reach him during the rest of the full-day hearing, or why he was not able to reconnect to the Webex platform. As a result, his case is dissimilar to E.B., in which a division of this court concluded that the juvenile court abused its discretion by declining to continue a termination hearing to allow the father to reappear after he dropped from the Webex platform. E.B., ¶ 17. Counsel for the father in E.B. represented to the court during the hearing that the father had a “Wi-Fi phone,” meaning he could only make calls when connected to Wi-Fi. Id. at ¶ 6. He told the court that the paternal grandparents had informed him that the father had been using Wi-Fi at a gas station to connect to the 
9 virtual hearing but was asked to leave that location. Id. at ¶¶ 6-7. The father was then unable to reconnect to the Webex platform. Id. at ¶ 7. ¶ 19 Unlike the father in E.B., father here does not identify anything in the record suggesting that his failure to return to the Webex hearing was not by choice. Instead, he focuses on what he would have testified to if present — the Department’s efforts to support reunification, his efforts to contact the Department and communicate about the treatment plan, and his efforts to see the child. But he does not claim that this evidence was only available through his testimony, and he was represented by competent counsel at the hearing who was able to examine the remaining witnesses about these topics. Accordingly, father was not denied due process. ¶ 20 In addition, father makes no meaningful argument that a continuance would serve the child’s best interests. He argues only that it was in the child’s best interests “for his father to be afforded his due process rights” and that a continuance would not have had “any detrimental effect on the child” because the kinship placement was meeting the child’s needs. We have already concluded that 
10 father was not denied his due process rights. And detriment to the child is not the standard by which the juvenile court was to evaluate father’s request for a continuance. ¶ 21 Ultimately, the juvenile court found that further delay was not in the child’s best interests and that finding is supported by the record. We perceive no abuse of discretion. III. Termination of Parental Rights ¶ 22 Father contends that the juvenile court erred by finding him unfit to parent the child and unlikely to become fit in a reasonable time. Mother contends that the court erred by finding that the Department made reasonable efforts to reunify her with the child. Finally, both parents contend that the court erred by finding no available less drastic alternative to termination. We disagree with each of these contentions and therefore affirm the juvenile court’s termination judgment. A. Statutory Criteria and Standard of Review ¶ 23 To terminate parental rights, the Department must establish by clear and convincing evidence that (1) the child has been adjudicated dependent or neglected; (2) the parent did not comply with or was not successfully rehabilitated by an appropriate, court-
11 approved treatment plan; (3) the parent is unfit; and (4) the parent’s conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2021; People in Interest of C.H., 166 P.3d 288, 289 (Colo. App. 2007). ¶ 24 Where resolution of an issue necessitates application of the termination statute to evidentiary facts, it presents a mixed question of fact and law. People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 15. We review the juvenile court’s factual findings for clear error. C.R.C.P. 52. The credibility of witnesses; the sufficiency, probative effect, and weight of the evidence; and the inferences and conclusions to be drawn therefrom are all within the province of the juvenile court. People in Interest of C.A.K., 652 P.2d 603, 613 (Colo. 1982). But a determination of the proper legal standard to be applied and the application of that standard to the particular facts of the case are questions of law that we review de novo. M.A.W. v. People in Interest of A.L.W., 2020 CO 11, ¶ 31. B. Fitness and Additional Time ¶ 25 Father contends that the juvenile court erred by finding him unfit to parent the child. He argues that the Department presented no evidence that father was unwilling to give the child reasonable 
12 parental care because it “had no evidence or knowledge to assess [father’s] ability to care for his son.” In the alternative, father contends that the district court erred by finding that he was unlikely to become fit in a reasonable time. We disagree. 1. Relevant Law ¶ 26 An unfit parent is one whose condition or conduct renders them unable to give a child reasonable parental care. People in Interest of D.P., 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide “nurturing and safe parenting sufficiently adequate to meet the child’s physical, emotional, and mental health needs and conditions.” § 19-3-604(2); see also People in Interest of A.J., 143 P.3d 1143, 1152 (Colo. App. 2006). ¶ 27 In determining unfitness, the court shall consider, among other things, a parent’s excessive use of controlled substances and whether reasonable efforts by child-caring agencies have been unable to rehabilitate the parent. § 19-3-604(2)(e), (h). “Reasonable efforts” means “the exercise of diligence and care” to reunify a parent with their children, and it includes “[s]ervices provided by a 
13 county or city and county in accordance with section 19–3–208.” § 19–1–103(114), C.R.S. 2021. ¶ 28 The Department is responsible for providing services to support the objectives of the parent’s treatment plan, which in turn must be reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time. § 19-1-
103(12). Thus, the objectives of the parent’s treatment plan, the services provided to meet the objectives, and the parent’s compliance with the objectives are inextricably linked with the court’s determination of fitness. See People in Interest of S.N-V., 300 P.3d 911, 915 (Colo. App. 2011); People in Interest of K.B., 2016 COA 21, ¶ 16. ¶ 29 When determining whether a parent’s conduct or condition is likely to change within a reasonable time, a juvenile court may consider whether any change has occurred during the pendency of the dependency and neglect proceeding, the parent’s social history, and the chronic or long-term nature of the parent’s conduct or condition. E.S.V. v. People in Interest of C.E.M., 2016 CO 40, ¶ 22. A reasonable time is not an indefinite time, and it must be 
14 determined by considering the physical, mental, and emotional conditions and needs of the child. A.J., 143 P.3d at 1152. 2. Analysis ¶ 30 On appeal, father does not contend that his treatment plan was inappropriate or that the Department failed to make reasonable efforts to reunify him with the child. Thus, his fitness depends in significant part on his compliance with and the success of his treatment plan. In EPP cases, however, no parent shall be found to be in reasonable compliance with or have been successful at a court-approved treatment plan when the parent has not attended visits with the child as set forth in the treatment plan, unless good cause can be shown for failing to visit, or when a parent exhibits the same problems addressed in the treatment plan without adequate improvement. § 19-3-604(1)(c)(I)(A)-(B). ¶ 31 The juvenile court found that father was not fit based on ongoing concerns about his mental health, substance abuse, and ability to care for and protect the child. The court noted that father did not meaningfully participate in his treatment plan and, most importantly, did not regularly visit the child and had not seen the child in ten months. The court found that father made little 
15 progress in the fourteen months the case was open and did not show that he was willing or able to dedicate himself to treatment and become fit in a reasonable time. The record supports the juvenile court’s findings. ¶ 32 Father’s treatment plan required that he maintain and enhance his bond with the child by, among other things, visiting regularly with the child. The caseworker testified that father had only one in-person, supervised visit with the child early in the case. During that visit the child screamed, ran away from the parents, and tried to hide. The child pressed himself against the wall and was not receptive to father’s attempts to play or give affection. Although the child later settled down during that visit and allowed mother to hold and comfort him, he never warmed to father. ¶ 33 Following that first visit, father participated in a few virtual visits. The Department arranged an in-person visit for the child’s birthday in June of 2020. Great aunt and uncle transported the child from their home in Colorado Springs to Denver for the visit, but father did not show up, leaving the child distraught. Father did not see the child again and stopped communicating with the caseworker. 
16 ¶ 34 Father’s treatment plan also required that he stabilize his mental health and address issues of substance abuse by, among other things, completing a dual-diagnosis evaluation, consistently engaging in treatment, and complying with requests for random drug testing. The caseworker testified that she referred father for urinalysis tests (UAs) and for a dual-diagnosis mental health and substance abuse assessment, but he did not participate in those services. The caseworker told the court that she had the same concerns about father’s mental health and substance abuse problems as she did when the proceeding began. ¶ 35 In addition, father’s treatment plan required that he work with the Department to address and minimize child protection concerns by, among other things, cooperating with the Department, notifying the caseworker of any changes of address, and resolving all criminal matters. And the treatment plan required that father provide the child with a safe and stable home where the child’s basic needs were sufficiently met. The caseworker testified that father did not maintain contact with the Department and that she did not know where father lived or worked. She also testified that father had 
17 been incarcerated at various times throughout the case, including during February and March preceding the April 2021 hearing. ¶ 36 The caseworker further testified that, in her opinion, father was not able to meet the child’s physical, emotional, or mental health needs. She concluded that it would not be in the child’s best interests to allow father more time to address the issues that brought the family to the attention of the Department because the child had not seen him in ten months, the child protection concerns identified by the Department “would not be able to be resolved in a reasonable amount of time,” and, even if such issues were addressed, rebuilding a relationship with the child “would take a long, long time.” ¶ 37 Despite this record, father argues that the Department did not present evidence that he was unwilling or unable to give the child reasonable parental care because the caseworker admitted she had no evidence or knowledge of father’s ability to care for the child. By relying on the caseworker’s testimony to find him unfit, he contends, the juvenile court erroneously placed the burden on him to prove that he could provide reasonable parental care instead of requiring the Department to prove by clear and convincing evidence 
18 that he could not. For this same reason, he argues that the court erred by finding that his conduct or condition was unlikely to change within a reasonable time; he does not otherwise demonstrate how that finding was clearly erroneous. ¶ 38 True, the caseworker testified that, because father had not kept in touch with the Department or engaged in visits or treatment, she was not able to fully assess his ability to parent. But it is a parent’s responsibility to comply with the treatment plan. People in Interest of A.H., 736 P.2d 425, 428 (Colo. App. 1987). And the evidence establishes that father did not comply with even the basic requirements of communicating with the Department or visiting the child so that the Department could make the assessment he now claims is lacking. ¶ 39 The Department put in place services to render father fit by meeting the objectives of his treatment plan, but father did not take advantage of the services and remained unfit. See People in Interest of K.T., 129 P.3d 1080, 1082 (Colo. App. 2005) (concluding that mother’s failure to comply with certain treatment plan objectives demonstrated that she was not committed to meeting the child’s needs and was unfit to parent). On this record, we cannot conclude 
19 that the juvenile court erred when it found father unfit and unlikely to become fit in a reasonable time. C. Reasonable Efforts ¶ 40 Mother contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate her and reunify her with the child because the caseworker did not communicate with her while she was incarcerated to learn about how her homelessness or lack of a phone prevented her from participating in services. We are not persuaded. 1. Relevant Law ¶ 41 The state must make reasonable efforts to reunify the family when an abused or neglected child is placed out of the home. § 19-
3-100.5, C.R.S. 2021. “‘Reasonable efforts’ . . . means the exercise of diligence and care . . . for children . . . who are in . . . out-of-
home placement . . . .” § 19-1-103(114). When a court decides whether a parent is unfit or whether her conduct or condition will change, it must evaluate whether the Department’s reasonable efforts have been unable to rehabilitate her. § 19-3-604(2)(h); S.N-
V., 300 P.3d at 915. 
20 ¶ 42 The Department satisfies the reasonable efforts standard if it provides services in accordance with section 19-3-208, C.R.S. 2021. See People in Interest of J.A.S., 160 P.3d 257, 262 (Colo. App. 2007). Such services include screening, assessments, home-based family and crisis counseling, information and referral services to available public and private assistance resources, visitation services for parents with children in out-of-home placement, and placement services including foster care and emergency shelter. § 19-3-
208(2)(b). Additional services should be made available if they are determined to be necessary and appropriate by the case plan and if adequate funding exists. § 19-3-208(2)(d). Examples of additional services include providing transportation to required services when other transportation is not available, mental health services, and drug and alcohol treatment services. Id. ¶ 43 Once services are provided, however, the parent becomes responsible for utilizing those services to obtain the assistance that she needs to comply with her treatment plan’s requirements. People in Interest of J.C.R., 259 P.3d 1279, 1285 (Colo. App. 2011). 
21 2. Analysis ¶ 44 The juvenile court found that the Department made reasonable efforts to rehabilitate mother. It found that the Department made referrals for a dual-diagnosis evaluation, sobriety monitoring, and visitation services. The court acknowledged mother’s testimony that she could not participate in most services because she did not have access to a phone. But it found that mother did not notify the caseworker of this barrier and that the Department “cannot put forward reasonable efforts to overcome an obstacle of which it is not aware.” In sum, it found that mother was able to have some communication with the caseworker and a few video visits with the child, but it was mother’s responsibility to tell the caseworker why she could not have more consistent engagement. Evidence in the record supports the court’s findings. ¶ 45 The caseworker testified that, following the first in-person visit with the child, mother was referred for virtual visits but did not respond to the provider’s efforts to reach her. Even so, mother was able to have one or two video visits each month facilitated by great aunt and uncle. 
22 ¶ 46 The caseworker referred mother for UAs but she never provided a sample. ¶ 47 The caseworker referred mother for a dual-diagnosis evaluation, which she eventually completed. The evaluation recommended that mother attend dual-diagnosis treatment, but she did not attend the intake for treatment. ¶ 48 At the hearing, mother testified that a caseworker visited her while she was incarcerated. She also testified that she did not engage in any services because she was homeless and because she did not have a phone or means to access virtual services. But she admitted that she did not tell the caseworker about her living situation or lack of a phone. The caseworker testified that the Department could have provided assistance for mother to access virtual services, but that she did not know mother needed this help. ¶ 49 Based on this record, we cannot conclude that the juvenile court erred when it found that the Department made reasonable efforts. D. Less Drastic Alternatives ¶ 50 Mother and father both contend that the juvenile court erred by finding no less drastic alternative to termination. Specifically, 
23 they argue that the juvenile court should have ordered an allocation of parental responsibilities (APR) to great aunt and uncle. We are not persuaded. 1. Relevant Law ¶ 51 The juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. T.M., ¶ 19. When considering less drastic alternatives, the court bases its decision on the best interests of the child, giving primary consideration to the child’s physical, mental, and emotional conditions and needs. § 19-3-604(3). “[I]f a proposed alternative to termination is to be deemed viable, it must not only be adequate, it must be in the child’s best interests.” T.M., ¶ 27. ¶ 52 When determining whether placement with a relative or other person is a viable alternative to termination, the juvenile court may consider various factors, including whether an ongoing relationship with the parent would be beneficial or detrimental to the child. People in Interest of A.R., 2012 COA 195M, ¶ 38. This determination will be influenced by a parent’s fitness to care for the child’s needs. See  § 19-3-604(2); A.R., ¶ 38. Long-term placement with a relative is not a viable less drastic alternative to termination if 
24 the child needs a stable, permanent home that can only be assured by adoption. People in Interest of M.B., 70 P.3d 618, 627 (Colo. App. 2003). 2. Analysis ¶ 53 The juvenile court found no available less drastic alternative to termination. It found that the parents had not maintained a bond with the child, did not have stable living environments, and had pending criminal matters. The court noted that the benefit of stability and permanency outweighed an ongoing relationship with the parents and that adoption was in the child’s best interest. Evidence supports the juvenile court’s findings. ¶ 54 The caseworker testified that father had not seen the child for ten months at the time of the termination hearing. Mother had only sporadic video visits and occasionally saw the child at family functions. Both parents had periods of incarceration throughout the proceeding and the court took judicial notice of several pending criminal matters. ¶ 55 The caseworker testified that the child had been with great aunt and uncle for over a year and that adoption by them was in his best interests. She explained that the child displayed 
25 aggression, needed socialization and a regular schedule, and required play therapy. She testified that the child was thriving in great aunt and uncle’s care. ¶ 56 The parents argue that no evidence suggested that great aunt and uncle were opposed to an APR and only wanted to adopt. But that evidence would be relevant only if the juvenile court found that an APR would be in the child’s best interests. See T.M., ¶ 32 (“[I]f a trial court considers a less drastic alternative in connection with its overall consideration of the statutory criteria for termination and finds that termination is in the child’s best interests, it must reject the alternative and order termination.”). Here, the court found, with record support, that a less drastic alternative to termination was not in the child’s best interests. ¶ 57 Based on this record, we cannot conclude that the juvenile court erred when it found that an APR to great aunt and uncle was not an available less drastic alternative to termination. IV. Conclusion ¶ 58 We affirm the judgment. JUDGE BERGER and JUDGE JOHNSON concur.